# HILO SUGAR COMPANY *vs.* MIOSHI.

### SUBMISSION WITHOUT ACTION.

HEARING, JANUARY 21, 1891.   DECISION, MARCH, 5, 1891.

JUDD, C.J., McCULLY, BICKERTON, JJ. DOLE, J., DISSENTING.

1.  The Masters and Servants Law of this Kingdom is not contrary to the 11th Article of the Constitution, which prohibits involuntary servitude except for crime.

2.  A Labor Contract made in Japan, to be executed in this country, contained provisions as to exemption from taxes, etc.: the exemptions not having been violated, the Court does not consider them further.

3.  The labor contract in question was not assigned.

4.  Stamps are not required on labor contracts with the Hawaiian Government or Board of Immigration.

### SUBMISSION.

The undersigned, Mioshi, a Japanese by birth, and the Hilo Sugar Company, respectfully represent that they are parties to a question in difference which might be the subject of a civil action.   That they have agreed upon a case containing the facts upon which said controversy depends, which are as follows:

1.   That said Hilo Sugar Company is a Hawaiian corporation, doing business in the District of Hilo, Island of Hawaii.

2.   That said Mioshi is serving the Hilo Sugar Company under an instrument in writing signed in Japan by said Mioshi and R. W. Irwin, the duly authorized agent of the Board of Immigration of the Hawaiian Kingdom, a copy of which said contract is hereunto annexed and made a part hereof, marked Exhibit "A."

3.   That in pursuance of said instrument said Mioshi proceeded from Japan to Honolulu, and upon his arrival in the

Hawaiian Kingdom was directed by the Board of Immigration to work for the Hilo Sugar Company.

4.   That said Mioshi in pursuance thereof went to work for the Hilo Sugar Company in the month of February, A.'D. 1889, and has ever since continued to work for said company under the terms of said instrument.

5.   That said Mioshi now contends that he cannot be compelled to serve said Hilo Sugar Company under said contract for the following reasons:   First, that he is unwilling to work for said Hilo Sugar Company, and such involuntary servitude is prohibited by the Constitution.   Second, that he had no power under the Constitution to alienate his liberty.   Third, that the Board of Immigration had no right or authority to make said contract in the name of the Hawaiian Government. Fourth, that the Hawaiian Government is not bound by said contract.   Fifth, that the Board of Immigration exceeded its authority by undertaking that the said Mioshi should be exempt from all and every kind of personal tax, and have the full, equal and perfect protection of the laws of Hawaii.   Sixth, that said contract could not be assigned without his consent. Seventh, that neither the Board of Immigration nor the Hawaiian Government is a person within the meaning of Section 1417 of the Civil Code, authorizing labor contracts.   Eighth, that the contract is not properly stamped.   Ninth, that the assignment is not properly stamped.

And said parties aver that said controversy is real, and that these proceedings are taken in good faith to determine the rights of the parties.

### Opinion of the Court, by Judd, CJ.

The legal questions involved may be summarized into three points.   (1) Is the law of Masters and Servants constitutional? (2) Is the contract legally binding?   (3) Is the contract properly stamped?   We shall discuss these questions in the above order.

It is claimed by the defendant that, as he is now unwilling to carry out his contract or work any longer for the Hilo Sugar

Company, the law which compels him to do so is unconstitutional, as his labor under the circumstances would be "involuntary servitude," which is forbidden by Article 11 of the Constitution. This article reads, "Involuntary servitude, except for crime, is forever prohibited in this Kingdom. Whenever a slave shall enter Hawaiian territory, he shall be free."

Article 11 of the Constitution of 1864 is identical. Article 12 of the Constitution of 1852 reads, "Slavery shall, under no circumstances whatever, be tolerated in the Hawaiian Islands; whenever a slave shall enter Hawaiian territory he shall be free; no person who imports a slave, or slaves, into the King's dominions shall ever enjoy any civil or political rights in this realm; but involuntary servitude for the punishment of crime is allowable according to law."

The first Constitution, of 1840, guaranteed "life, limb, liberty, freedom from oppression, earnings of his hands and the productions of his mind," but not to those who act in violation of the laws. It also established that no service or labor should be required of any man in a manner which is at variance with the above sentiments.

The earliest legislation on the subject of masters and servants was passed by the Legislature on the 21st of June, 1850, entitled, "An Act for the Government of Masters and Servants." It contained the provisions (Sec. 22) that any person who has attained the age of twenty years may bind himself, or herself, by written contract to serve another in any art, trade, profession, or other employment for any term not exceeding five years;" and also in Sec. 23, "All engagements of service contracted in a foreign country to be executed in this, unless the same be in contravention of the laws of this, shall be binding here; provided, however, that all such engagements made for a longer period than ten years shall be reduced to that limit, to count from the day of the arrival of the person bound in this Kingdom."

These provisions of law have remained on our statute book unaltered and unrepealed for a period of over forty years. They were incorporated into the Civil Code of 1859 as Sections 1417

and 1418. They were a part of the law of the land, and the system of labor authorized by them was in active operation at the time when the Constitution of 1852 was "granted by Kamehameha III., by and with the advice and consent of the Nobles and Representatives in legislative council assembled," which prohibited slavery. They continued as law while the Constitutions of 1864 and 1887, which prohibited "involuntary servitude except for crime," were promulgated.

These provisions have not been amended by any of the various legislatures from 1850 to 1890, but some parts of the further provisions of the law, which provide for the enforcement of the contracts for labor, have been the subject of frequent legislative discussion and amendment. Many parts of the Act have also been the subject of judicial construction, but the principle that a person may make a binding contract to serve another for a term has remained untouched, and upon it our agricultural enterprises rest in great measure.

The legislature, then, and the people have given a practical interpretation to the Constitution, that our system of contract labor is not the involuntary servitude forbidden by that instrument. Suppose, however, the legislature and the community are wrong and the contention of defendant is right. While not adopting the principle that "communis error facit jus," we as judges, in interpreting the organic law, must not be blind to the view which the statesmen and law-makers of this country have uniformly entertained towards this law.

That slavery was the "involuntary servitude" intended to be prohibited by the Constitution is evident from what follows in the same Article, "whenever a slave shall enter Hawaiian territory, he shall be free." The word "servitude" is defined by lexicographers to be, as its first and most obvious meaning, "the condition of a slave," "the state of involuntary subjection to a master," "slavery," "bondage." The second definition, which is declared by the dictionaries to be less common and less proper, is the "state of a servant." Now, even if the secondary meaning of the word servitude be taken, to wit, the "state of a servant," or the condition of working for or serving

another, the qualifying word "involuntary" cannot be over-looked.   A state or condition of service of one person to another must be involuntary, that is, without the will or against the will of the person so serving, to come within the prohibition.

A fair and honest contract to work for another, willingly and freely made with a knowledge of the circumstances, cannot be said to have created a condition of involuntary servitude.   The contract which creates the state or condition of service, if it is voluntary when made and the conditions and circumstances remain unchanged, except that the mind of the one who serves is now unwilling to fulfill it, is not by that fact changed into a contract of involuntary servitude forbidden by law.   If the con-tract is lawful and constitutional in its inception, it does not be-come illegal or unconstitutional at the option of one of the par-ties to it.

The unwillingness or the incapacity of a party to a contract to fulfill it are not fatal to its validity.   If the Constitution pro-hibits any service which has become for any reason or without any reason against the will or inclination of the contractor, its intent to effectuate this should be expressed in language not doubtful.   The Master and Servants' Act declares that such contracts may be lawfully entered into.   And it is a fundamen-tal rule of construction that " Courts are never to declare an act void unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt.   A reasonable doubt must be solved in favor of legislative action and the act sus-tained."   Cooley Const. Lim., p. 182, and cases cited.

"The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."   *Fletcher vs. Peck*, 6 Cranch, 128.   " It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body by which the law is passed, to presume in favor of its validity, until its violation of the Constitution is proved beyond all doubt."   *Og-den vs. Saunders*, 12 Wheat., 270.

Our labor contract system is not slavery.   Reference is made to an expression in *The Slaughter-house Cases*, 16 Wall., 72:

"If Mexican peonage or the Chinese coolie labor system shall develop slavery of the Mexican or Chinese race within our territory, this amendment" may safely be trusted to make it void.

The amendment is the 13th to the Constitution of the United States, as follows: "Neither slavery, nor involuntary servitude except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, nor any place subject to their jurisdiction."

We do not hesitate to say that if the Master and Servants' law shall be found to develop slavery of any race within our Kingdom, this Article 11 of our Constitution may safely be trusted to make it—the slavery—void. The numerous decisions of this Court on this Act afford ample ground for the expectation that no form of slavery would be held by the Court to be countenanced by the Constitution. We have thus come to the conclusion that the contract of the defendant is not invalid on the ground alleged, and that the law which authorizes it is not repugnant to the Constitution.

The further objections urged on the part of the defendant why he should not be compelled to work for the Hilo Sugar Company, are (1) that the Board of Immigration had no right or authority to make such contract in the name of the Hawaiian Government; (2) that the Hawaiian Government is not bound by said contract; and (3) that the Board of Immigration exceeded its authority by undertaking that the said Mioshi should be exempt from all and every kind of personal tax and have the full, equal and perfect protection of the laws of Hawaii.

We dismiss these objections with the remark that there is nothing in the submission to show that the Hawaiian Government does not consider itself bound by the contract, or that the authority of the Board of Immigration to make the contract in the name of the Government is disputed; also that it is not claimed that the guarantee of exemption from personal taxes has not been observed, or that the protection of the laws of Hawaii has not been extended to the defendant.

Objection 6 is "that said contract could not be assigned without his consent." If the contract of labor in question has been

assigned without the laborer's assent, a serious question would be raised. But it is not claimed by defendant's counsel that the contract has been formally assigned. An inspection of the contract shows that it has not been assigned. It still subsists as a contract between the Hawaiian Government and the defendant, and the defendant is found with "employment as an agricultural laborer" with the Hilo Sugar Company, which engages to pay the stipulated wages and to perform all the stipulations and agreements to be performed by the Board of Immigration in favor of the laborer, the Board reserving the right to cancel the contract for any cause to be deemed sufficient by the Board. In any suit to compel the laborer to fulfill his engagement to work, the plaintiff would have to be, in correct practice, the Board of Immigration of the Hawaiian Government, and the suit of the laborer would have to be brought against the same party.

Objection 7 is "that neither the Board of Immigration nor the Hawaiian Government is a person within the meaning of Section 1417 of the Civil Code authorizing labor contracts." Section 1424, a part of the labor law, recognizes the validity of a contract of service to a company of individuals. This point was not alluded to in argument, and we have no doubt that the statute allows contracts of service with the Government or the Board of Immigration.

The last objections by the defendant are that neither the contract nor the assignment are properly stamped. The Act relating to stamp duties, passed in 1876, prescribes that no instrument requiring to be stamped shall  *  *  be of any validity in any Court of this Kingdom unless the same shall be properly stamped. Provision is made for the payment into Court of the stamp duty to enable the instrument to be used in evidence. And that instruments executed in foreign countries may be stamped within three months after their arrival in this Kingdom without the payment of any penalty. If after that time, they are liable to pay a double duty.

The want of a stamp does not make the contract invalid. But we must consider the matter by the terms of the submission as if the contract was now offered in evidence. It is unstamped.

The object of the law was to obtain revenue for the Government. The Stamp Act requires a stamp of $1 on contracts between masters and servants for labor, and $1 for each year and part of a year after the first; the duty to be charged on each copy and to be paid by the employer. In the case before us the Government is the employer. Shall the Government pay a duty owing to itself? We think the question answers itself.

Judgment for the plaintiff.

### DISSENTING OPINION OF DOLE, J.

It is my opinion that the contract in this case is not enforceable for the reason that it is not a contract between the parties. It is, in brief, a contract between the Hawaiian Government and the defendant, in which the latter substantially agrees to labor for such master or masters as the Hawaiian Government shall select, although this purpose is skillfully veiled in language which dwells somewhat conspicuously upon the guarantee of the Hawaiian Government to furnish the defendant with employment. The contract binds him to accept such employment as the Hawaiian Government may assign him to, in other words, to accept such master as the Hawaiian Government may select for him, and if he objects, to abide by the decision of the Bureau of Immigration, a bureau of the Hawaiian Government.

On the back of the contract is endorsed an agreement between the Board of Immigration and the Hilo Sugar Company, dated over two weeks after the original contract, by which the defendant is handed over to the Hilo Sugar Company, and they stipulate to carry out the covenants made by the Board of Immigration in favor of the defendant in said contract. As a matter of fact there is no such contract, the original contract being between the Hawaiian Government and the defendant, who is not a party to this agreement, assigning him to the Hilo Sugar Company. So we have before us the case of a laborer held for service under a contract, penally enforceable, if enforceable at all, to masters with whom he has never contracted; but he has come into their hands, without having the opportunity of choosing his employers, by a process suspiciously similar to that by which a Hono-

lulu hack, horse and harness are hired out to a driver. The fact that the laborer receives proper wages for his work does not take the case out of that condition of involuntary servitude or semi-slavery which is inconsistent with our Constitution and laws, and with the general tenor of the decisions of this Court, with one or two solitary exceptions.

The case of *Nott vs. Kanahele*, 4 Hawn., 14, is, I admit, distinctly opposed to the above view, but I believe that decision to be wholly erroneous. That was not, however, as evident a case against personal liberty as the one before the Court, as the plaintiffs were the original contractors, and, having sold their plantation, they brought the suit to compel their laborer to work on the plantation they had sold, he having agreed by his contract to work for their assigns in case of a sale. But in the case before the Court there is no privity whatever between the parties ; the plaintiffs are the purchasers of the defendant's contract at cost from the Hawaiian Government. This is, I think, the clear common sense view of the transaction, in spite of the strenuous avoidance of any appearance of such a meaning in the language of the instrument.

It sometimes happens that, in the final settlement of a legal question, the best law is found in a dissenting opinion. This is, I think, the case in *Nott vs. Kanahele*, and I desire to quote briefly from the dissenting opinion in that case of Mr. Justice Judd:

"The words of Section 1417 (Civil Code) above quoted, 'any person * * * may bind himself to serve another,' means that he may bind himself to serve an individual who is ascertained and known to the laborer at the time of making his contract, or who could be ascertained by the laborer if he made inquiry. This section does not authorize a man to make a contract to serve one who is wholly unascertained, or who is to be ascertained independently of the servant's will. The policy of our institutions and laws forbids the making of such contracts," (p. 17).

"There is no enactment of the Legislature that will compel a man to work for another *or his assigns*," (p. 18.).

"If a man could be passed from one to another, like a chattel, by an assignment of his contract, it reduces him at once to a chattel, and this is a form of involuntary servitude which, though for a limited period, is nevertheless repugnant to the policy of our institutions and forbidden by Article 11 of the Constitution" (of 1864), ( p. 18-19).

"If a contract, that is, an agreement by which one person binds hinself to serve another, is in its essence and nature unassignable, the law will not allow a laborer to make a contract which is in its terms assignable. He cannot make an engagement which is illegal and inconsistent with the liberty which every man has of choosing his own employer. He may not so barter away his freedom in advance." (p. 19.)

It would not be easy to improve on the wording of these citations in stating the prevailing legal sentiment of the civilized world on this question. This position is supported by *Waihee Plantation vs. Kalapu*, 3 Hawn., 760; *Dreier vs. Kuaa*, 4 Hawn., 534, and *In re Gip Ah Chan*. 6 Hawn., 25.

In *Dreier vs. Kuaa* the Court say, (p. 536): "We cannot direct the defendant's labor on this plantation, for he (Dreier) has no interest in it; there is no privity of contract between these laborers and the owner of the Koloa Sugar Company, and therefore the defendants cannot be compelled to work on this plantation."

The case of *Gip Ah Chan* was tried in Chambers before Mr. Justice Hartwell, in 1870, and his decision contains the following language, (p. 41): "I do not regard that a contract is enforceable under this penal statute and within its meaning, unless it is in writing, designating the parties either by name or in such a manner that they can be ascertained precisely at the date of the contract. It is unnecessary to comment on the wisdom of a statute restricting the enforcement by penal servitude of contracts for labor to those which are made in writing with another, or with a firm, or on considerations which might arise on a law which allowed the penal enforcement of contracts between parties not named or ascertained at the date of the contract."

The liberty of choosing one's own employer is undoubtedly within the inalienable rights guaranteed to "all men" by Article 1 of the Constitution. How, then, can one alien dispose of such liberty? A contract waiving this right is inconsistent with this great provision of the Constitution, and is therefore illegal and void. This is what the contract before us distinctly does.

I am also of the opinion that the instrument requires to be stamped. This requirement is clearly set forth in the statutes, and no exception is made. Chapter 55 of the Laws of 1876 requires this, and provides that "no instrument requiring to be stamped shall * * * be of any validity in any Court of this Kingdom unless the same shall be properly stamped." (Section 9). And Chapter 30·of the Laws of 1886 provides that any agent to take acknowledgments of contracts "who shall certify to the acknowledgment of any contract not fully stamped shall be liable to a fine" of fifty dollars.

The argument of plaintiff's counsel that the Government, being the employer, would have to pay for the stamps, and therefore the Stamp Act does not apply to this contract, is not convincing to my mind. In fact, the Government is not the employer, nor does the contract pretend that such is the case. The Government has no work for these men, no plantations upon which to employ them; it is merely the channel through which the laborer reaches an employer. The contract is inchoate by its terms until it has been supplemented by the endorsement which provides an employer, and he, by law, is liable to stamp duty.

*F. M. Hatch*, for plaintiff.

*D. L. Huntsman*, for defendant.