IN THE MATTER OF THE CLAIM OF ERNEST A. MOTT-SMITH, ASSIGNEE OF J. B. AGASSIZ UNDER APPROPRIATION FOR RELIEF OF SAID J. B. AGASSIZ UNDER ACT 204 OF THE SESSION LAWS OF 1923.

No. 1663.

APPEAL FROM THE AUDITOR OF THE TERRITORY.

TRIAL JUNE 23, 24, 25, 1926.                    DECIDED JULY 14, 1926.

PERRY, C. J., BANKS, J., AND CIRCUIT JUDGE CASE IN PLACE OF LINDSAY, J., DISQUALIFIED.

STATUTES—*appropriations—payment of claims founded upon moral obligations.*

It is within the power of the legislature to appropriate money for the payment of a claim which, while not cognizable or enforceable in a court of law, is founded upon moral and honorable obligations and upon principles of right and justice.

SAME—*Act 204, L. 1923.*

The appropriation of money by Act 204, L. 1923, to be paid to a contractor by way of reimbursement for losses sustained in consequence of a change of conditions at the site (the ocean bottom) which was not and could not have been foreseen, is a rightful subject of legislation and within the power of the legislature to make.

OPINION OF THE COURT BY PERRY, C. J.

At its session of 1921 the legislature passed an Act (No. 166) reading as follows: "The treasurer of the Territory of Hawaii is hereby authorized and directed to pay, upon a warrant drawn by the auditor of the Territory, the sum of thirteen thousand two hundred dollars ($13,200.00) to J. B. Agassiz, for the purpose of reimbursing said J. B. Agassiz for the losses sustained in carrying out the terms of that certain contract entered into with the board of harbor commissioners of the Ter-

ritory of Hawaii, on or about May 7, 1919, for the construction of a reinforced concrete wharf at Hana, County of Maui, Territory of Hawaii." This Act was approved by the governor on April 25, 1921. In 1923 the following Act (No. 204) was passed:

"Section 1. The treasurer of the Territory of Hawaii is hereby authorized and directed to pay, upon a warrant drawn by the auditor of the Territory the sum of six thousand eight hundred seventy-nine and 20/100 dollars ($6,879.20) to J. B. Agassiz for the losses sustained in carrying out the terms of that certain contract entered into with the board of harbor commissioners of the Territory of Hawaii, on or about May 7, 1919, for the construction of a reinforced concrete wharf at Hana, County of Maui, Territory of Hawaii, said sum of six thousand eight hundred seventy-nine and 20/100 ($6,879.20) being in addition to the amount appropriated by Act 166 of the Session Laws of 1921.

"Section 2. Upon said payment by the Territory of Hawaii, the said J. B. Agassiz shall be required to release the Territory from all claims under or in respect of the said contract." This Act was approved by the governor on May 2, 1923. Under date of May 5, 1923, Agassiz assigned his claim to E. A. Mott-Smith, the present appellant. Upon request being made by Agassiz for a warrant in the sum of $13,200 in accordance with the provisions of the earlier Act, the auditor of the Territory demanded the execution and delivery by Agassiz of a release. This demand was complied with after some protest or argument and the amount appropriated by that Act was paid. After the approval of Act 204 of the Laws of 1923 and after demand by the claimant for the amount appropriated by the second Act the auditor refused to issue a warrant for the amount or any part thereof on the ground that the Act of 1923 was unconstitutional and

invalid. From the decision of the auditor thus rejecting the claim an appeal was taken to this court.

The position of the auditor as summarized in his formal answer on file is: (1) "that J. B. Agassiz on the 31st day of May, 1921, executed a release of the Territory of Hawaii 'from all further claims arising from the failure of said territorial officers to perform under said contract.'"; (2) "that said J. B. Agassiz has been fully paid for all just and legal claims arising out of said contract"; and (3) "that Act 204 of the Session Laws of 1923 is unconstitutional and void in that it constitutes a gift to J. B. Agassiz and/or his assignee resting upon neither a legal nor moral obligation or consideration." At considerable length evidence was adduced in this court tending to show the circumstances leading to the execution of the contract by Agassiz with the harbor commissioners for the erection of a wharf at Hana, Maui; the facts relating to the performance of that contract and the physical difficulties encountered in connection therewith; and the nature of the investigation conducted by the legislature and its committees at each of the sessions named preparatory to determining whether or not to grant the relief prayed for in the two bills, which subsequently became the Acts above quoted. The nature and extent of the evidence presented to the legislative committees was also to a large extent disclosed by the evidence adduced in this court.

The refusal of the auditor to issue a warrant in payment of the amount appropriated by the Act of the session of 1923 and the position taken by him in his answer in the present proceeding are in their essence an attack upon the constitutionality and validity of Act 204. It is claimed by him that the payment authorized by the appropriation would be in effect a gift to Agassiz and that the legislature is without authority to direct the payment of

public moneys to individuals by way of gift. While the judicial department of the government has the power and is under the duty, in proper cases, to declare laws unconstitutional, there can be no doubt at this day that laws duly passed by the legislature are to be deemed constitutional and valid unless the contrary clearly appears. All presumptions are in favor of constitutionality and validity. In cases of doubt, the doubts must be resolved in favor of constitutionality and validity. So, also, if the power exercised in the enactment of a law depends for its validity upon the existence of facts and circumstances, the presumption is that the necessary facts and circumstances did exist, until the contrary is clearly shown. With reference to all of these presumptions, favorable to constitutionality and validity, the burden is upon the person attacking the constitutionality of the law to show that the enactment cannot be supported as the exercise of any of the powers vested in the legislature or by the existing facts and circumstances.

"It is a fundamental rule of construction that 'courts are never to declare an act void unless the nullity and invalidity of the Act are placed, in their judgment, beyond reasonable doubt. A reasonable doubt must be solved in favor of legislative action and the Act sustained.' Cooley Const. Lim., p. 182, and cases cited." *Hilo Sugar Co.* v. *Mioshi*, 8 Haw. 201, 205.

"Every presumption is in favor of the constitutionality of Acts of the Legislature. An adverse doubtful construction is not sufficient to condemn an Act; it is only in cases of a clear and substantial departure from the provisions of the fundamental law that Courts will declare Acts of the Legislature invalid." *Bishop* v. *Judd*, 4 Haw. 29, 35, 36.

"The constitutionality of an act of Congress is a matter always requiring the most careful consideration. The

presumptions are in favor of constitutionality, and before a court is justified in holding that the legislative power has been exercised beyond the limits granted, or in conflict with restrictions imposed by the fundamental law, the excess or conflict should be clear." *Fairbank* v. *United States,* 181 U. S. 283, 285.

"It is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers and its acts to be considered as void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." *Livingston* v. *Darlington,* 101 U. S. 407, 410.

"In examining an act of Congress it has been frequently said that every intendment is in favor of its constitutionality. Such act is presumed to be valid unless its invalidity is plain and apparent. No presumption of invalidity can be indulged in; it must be shown clearly and unmistakably. This rule has been stated and followed by this court from the foundation of the government." *United States* v. *Gettysburg Elec. Ry. Co.,* 160 U. S. 668, 680.

To the same effect are: 26 A. & E. Ency. L. 640, 641, 642; 4 Ency. U. S. Rep. 250, 251, 252; *Fletcher* v. *Peck,* 6 Cranch 87; *Sinking Fund Cases,* 99 U. S. 700, 718; *Sweet* v. *Rechel,* 159 U. S. 380, 393; *Legal Tender Cases,* 12 Wall, 457, 531; *New York Life Ins. Co.* v. *Board of Commissioners,* 106 Fed. 123, 132, 133.

The legislative power of this Territory extends to "all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States locally applicable." Org. Act, Sec. 55.

For the purposes of this case it may be assumed that, as stated in the opinion of Chief Justice Robertson in the case entitled *In re Cummins,* 20 Haw. 518, 529, "the legislature has no power to levy taxes except for public pur-

poses and that the question what constitutes a public purpose is, in the last analysis, a question of law"; and also that "it is beyond the power of the legislature to authorize the expenditure of money raised by taxation by way of gift or gratuity to individuals in the absence of, at least, a moral obligation to support the appropriation." See, in this connection, 1 Cooley, Taxation, 4th ed., Secs. 87, 174; *Dodge* v. *Mission,* 107 Fed. 827, 829; and *Bush* v. *Supervisors,* 159 N. Y. 212, 216, 217. Nevertheless it is clearly the law that the legislative branch of the government in appropriating moneys to be paid to individuals is not confined to the payment of debts for which the government is legally liable but may also authorize the payment of debts which, while not recognizable as such or enforceable in a court of law, are founded in equity and conscience and constitute a moral obligation. When the surrounding circumstances are such that an individual, a man of honor, would in the absence of legal liability deem himself required or justified by honor and conscience to pay a sum of money as a debt founded upon or supported by a moral obligation, in such a case the legislature likewise may recognize the propriety of the payment and appropriate money therefor. Such an appropriation would be a rightful subject of legislation within the meaning of the Organic Act.

"Under the provisions of the Constitution (article 1, section 8), Congress has power to lay and collect taxes, etc., 'to pay the debts' of the United States. Having power to raise money for that purpose, it of course follows that it has power when the money is raised to appropriate it to the same object. What are the debts of the United States within the meaning of this constitutional provision? It is conceded and indeed it cannot be questioned that the debts are not limited to those which are evidenced by some written obligation or to those

which are otherwise of a strictly legal character. The term 'debts' includes those debts or claims which rest upon a merely equitable or honorary obligation, and which would not be recoverable in a court of law if existing against an individual. The nation, speaking broadly, owes a 'debt' to an individual when his claim grows out of general principles of right and justice; when, in other words, it is based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law. The power of Congress extends at least as far as the recognition and payment of claims against the government which are thus founded. To no other branch of the government than Congress could any application be successfully made on the part of the owners of such claims or debts for the payment thereof. Their recognition depends solely upon Congress, and whether it will recognize claims thus founded must be left to the discretion of that body." *United States* v. *Realty Co.*, 163 U. S. 427, 440, 441.

"Nevertheless, it seems eminently proper and just in some exceptional cases to recognize a moral obligation resting on the public to share with the persons injured the damage sustained and this can only be done by means of taxation. All governments are accustomed to recognize and pay equitable claims of this nature under some circumstances; claims, for instance, * * * for loss in performing a contract to construct it" (public work). "In these cases the legislature is not confined in making compensation within the strict limits of common-law remedies but it may recognize moral or equitable obligations such as a just man would be likely to recognize in his own affairs, whether by law required to do so or not." 1 Cooley, Taxation, 4th ed., Sec. 194.

"The legislature is not confined in its appropriation of

the public moneys, or of the sums to be raised by taxation in favor of individuals, to cases in which a legal demand exists against the state. It can thus recognize claims founded in equity and justice in the largest sense of these terms." *Guilford* v. *Supervisors,* 13 N. Y. 143, 149. See also *Blanding* v. *Burr,* 13 Cal. 343, 354.

In the case at bar no specific provision of the Constitution is pointed to by the auditor as having been violated by the legislature in the adoption of Act 204, L. 1923. The contention is merely that this was not a rightful subject of legislation and, more specifically, that the appropriation was purely a gift to a private individual, not supported by any moral obligation or considerations founded upon equity, honor and good conscience. In other words, the claim is that it is the particular facts and circumstances surrounding the case which show that the legislature exceeded its powers. Even in such a case, the presumptions are all in favor of validity. If upon facts which are undisputed honest men may differ as to whether honor and good conscience and equity require or justify the payment the appropriation must be sustained. In such a case invalidity does not appear with such a degree of clearness as to justify the court in interfering. "It is a well settled rule of constitutional exposition, that if a statute may or may not be, according to circumstances, within the limits of legislative authority, the existence of the circumstances necessary to support it must be presumed." *Sweet* v. *Rechel,* 159 U. S. 380, 393.

"The judiciary can only arrest the execution of a statute when it conflicts with the Constitution. It cannot run a race of opinions upon points of right, reason and expediency with the lawmaking power." Cooley, Const. Lim., pp. 236, 237.

"In truth, the general proposition that Congress can direct the payment of debts which have only a strong

moral and honorable obligation for their support is not, as we understand it, denied by the learned counsel for the United States; but it is claimed that in these cases no foundation whatever is laid for its application. * * *

"In regard to the question whether the facts existing in any given case bring it within the description of that class of claims which Congress can and ought to recognize as founded upon equitable and moral considerations and grounded upon principles of right and justice, we think that generally such question must in its nature be one for Congress to decide for itself. Its decision recognizing such a claim and appropriating money for its payment can rarely, if ever, be the subject of review by the judicial branch of the government. Upon the general principle, therefore, that the government of the United States, through Congress, has the right to pay the debts of the United States, and that the claims in these cases are of a nature which that body might rightfully decide to constitute a debt payable by the United States upon considerations of justice and honor, we think the Act of Congress making appropriations for the payment of such claims was valid." *United States* v. *Realty Co.,* 163 U. S. 427, 443, 444.

Referring to the general rule that "the legitimate object of raising money by taxation is for public purposes" the court in *Weismer* v. *Douglas,* 64 N. Y. 91, 99, said: "When we come to ask, in any case, what is a public purpose, the answer is not always ready, nor easily to be found. It is to be conceded that no pinched or meager sense may be put upon the words, and that if the purpose designated by the legislature lies so near the border line as that it may be doubtful on which side of it it is domiciled, the courts may not set their judgment against that of the lawmakers."

"In doubtful cases the courts should not interfere with

the exercise of this legislative discretion and in all cases the legislative determination is entitled to great respect." *Board of Education* v. *State,* 51 O. St. 531, 539.

"It is not inconsistent with this doctrine of judicial review that in every instance the highest consideration should be paid to the determination of the legislature that a tax should be laid. It is not lightly to be assumed that its members have come to the examination of the subject with any other than public motives or that they have failed to give it due investigation or reflection. The presumption on the other hand must always be that they have considered it with honesty and fair purpose, and that their action is the result of their deliberate judgment. And with all these presumptions tending to support the legislative action, it would seem but reasonable and proper that the courts should support it when not clearly satisfied that an error has been committed." 1 Cooley, Taxation, 4th ed., Sec. 188.

"In regard to the question whether the facts existing in any case bring it within the class of claims which the legislature ought to recognize as founded upon equitable and moral obligations, it would seem that generally such question is largely one for the legislature to decide for itself." *Ib.,* Sec. 194.

The facts leading up to the appropriation in question are as follows: On May 7, 1919, J. B. Agassiz entered into a contract with the board of harbor commissioners of the Territory whereby he agreed to furnish all the materials (with the exception of Portland cement, reinforcing steel and wire, gravel and sand, water pipe, valves and fittings, which excepted materials the Territory was to furnish) required for the construction, complete in place, of a reinforced concrete wharf at Hana, Maui, and to construct said wharf and parts of an approach thereto and to furnish all labor, tools and equipment necessary and to blast

out certain coral growths in the same harbor. All of the work required by the contract was to be completed on or before December 16, 1919. The contract price was $38,969. The contract provided for the performance of extra work and for the pay to Agassiz for such extras of the cost to him plus 15%. Overhead expenses, however, were not to be deemed a part of any extras. Before the bids preceding this contract were called for, borings were made on the site of the proposed wharf at the instance of the board and the result of these borings was exhibited to intending bidders on blue prints and perhaps by other means. These borings showed that at the site chosen there was a hard rock bottom under the waters of the ocean and that between the hard rock bottom and the water there was a layer, varying in thickness here and there, of softer materials such as sand, coral and soil. The contract called for reinforced concrete piles to support the wharf and contemplated that these piles should be driven through the softer layer above mentioned to refusal on the hard rock bottom. It also was within the contemplation and understanding of both parties to the contract that this so-called softer layer of material was sufficient in thickness and in density to support in position the heavy concrete piles with the superimposed deck. The general specifications, which became a part of the contract, provided that "all bidders must visit the site and familiarize themselves with the existing conditions, and the successful bidder will be held to have examined the site, and no extra compensation will be made by reason of any misunderstanding or error on his part as regards the site and the conditions thereof." Mr. Agassiz probably did not make an examination of his own of the nature of the materials over the hard rock bottom of the ocean. There is no dispute in this case but that if he had made the examination prior to bidding he would have found precisely

the same layer of so-called softer materials which the government drillers found and which were represented by the board in its blue prints furnished to intending bidders. After the contract had been entered into, however, and a certain portion of the approaches to the proposed dock had been built, the currents of the ocean, as it is supposed by both parties to the present controversy, carried away practically all of the layer of softer materials at the site and left substantially nothing but the hard rock bottom of the ocean under its waters. This made indispensable a material change in the method of construction contemplated by both parties in entering into the contract and a substantial lengthening of many of the concrete piles. Instead of having the piles merely driven through the comparatively soft materials to refusal on the hard rock bottom, it became necessary to find or devise a drilling apparatus suitable for the job, with which to drill holes in the hard rock bottom to a sufficient depth to hold the concrete piles driven therein. It was not until December, 1919, the month when the contract should have been completed, that the necessary drill was found or devised. It is claimed that the contractor devised it and that he subsequently received a patent for it from the United States government. The board of harbor commissioners paid for its cost, $1100. This unforeseen change of conditions at the site, a change which could not reasonably have been anticipated either by the board or by the contractor and which certainly was not contemplated by either, caused delay in the erection of the wharf. The delay resulted in prices for materials and labor higher than those which the contractor had figured upon and which would have probably prevailed if the delays had not occurred. A strike occurred in San Francisco, California, during the period of the delays, rendering it more difficult for the contractor to obtain certain classes of labor.

From time to time the contractor secured from the board the latter's consent to extensions of time for the performance of the contract, some or perhaps nearly all of these extensions having been granted with the proviso that there would be "no additional cost to the Territory,"— by which was meant that any additional cost of inspection occasioned by the delays would be borne by the contractor. Other results claimed by the contractor to have been due to the delay were additional cost of workmen's compensation, loss of time by the contractor himself, loss of rental of equipment hired from others and increased amount of overhead expenditures.

There were doubtless delays, too, in the performance of the work which were due not to the unforeseen change of conditions in the ocean bottom but to lack of proper equipment and, possibly, some degree of inefficiency on the part of the contractor.

The contractor was paid by the board the contract price of $38,969 and for extras the sum of $12,386.35 or a total of $51,355.35. He was paid the additional sum of $13,200 appropriated by the legislature of 1921, making the total paid him $64,555.35. Mr. Bigelow, president of the harbor board and superintendent of public works, testified that the payment of $51,355.35 was all that was due the contractor and that the government received in the completed wharf no greater value than was represented by that payment. Mr. Bigelow, however, did not testify, and did not claim to know, what the total cost of the wharf was to Agassiz. Mr. Mott-Smith, who was the legal and financial advisor of Agassiz and an indemnitor to the surety company that was surety on the bond of Agassiz and who kept in his own office all of the accounts pertaining to the contract and the erection of the wharf and who was perfectly familiar with all of the details of the matter, testified that the total cost of the

wharf to Agassiz was a little over $99,000. Making allowances, however, for certain items entering into the total of $99,000 which are claimed by the attorney general not to properly constitute a part of the cost of the project to Agassiz, it still remains true that the cost of the wharf to Agassiz was over $90,000. The bill introduced in the legislature in 1921 for his relief requested an appropriation in the sum of $29,882.44. The legislature allowed him $13,200. The bill introduced in 1923 for his further relief asked for an appropriation of $20,181.26. The legislature allowed the sum of $6,879.20, being the amount now in dispute. If he receives the amount appropriated by the last legislature, he will still suffer a net loss of $18,565 on the assumption that the total cost to him was $90,000 and correspondingly more if the total cost to him was $99,000.

While in the letters granting some of the extensions of time the board had made the reservation above named that the extensions would be without additional cost to the government, nevertheless, prior to the passage of Act 166 of 1921 no claim in figures had been submitted or communicated by the board to Agassiz for expenses of inspection incurred by reason of the delay. It was not until long after the passage of that bill that the claim was presented in figures for the first time. The amount of it then was $3,256.35. To the legislature of 1923 it was represented on behalf of Agassiz that to make this deduction from the last payment then due him under the contract, to-wit, $6,946.47, would be the equivalent of penalizing him for the unforeseen delays instead of granting him some measure of relief as the legislature of 1921 had sought to do. In addition, other items were claimed before the legislature of 1923 as representing losses suffered by the contractor in consequence of the unexpected conditions. These included, *inter alia,* $4200 for increase

in cost of labor, $840 for additional workmen's compensation, $1600 for 50% of salary of reconstruction foreman, $8000 for a loss of time to the contractor, $7200 for rental of construction equipment, $1160 for cost of additional length of piles, $940 for cleaning reinforcing steel, $4062.44 for additional fill on approach made necessary by certain alleged operations of the government, $480 for maintenance and operation of automobile, $800 for correspondence, accounting and costs of contractor's agents in Honolulu and $600 for increase in price of lumber necessary for concrete forms.

Under these circumstances it cannot be said that the legislature exceeded its powers in finding that there was a moral obligation on the part of the government to reimburse Agassiz to the extent that it did for his losses or in finding and concluding that honor, conscience and equity required that he be reimbursed to that extent.

He should not be reimbursed by the Territory for losses sustained by him in consequence of delays resulting from the inadequacy of the equipment used by him or from his possible inefficiency or for losses resulting from a failure to understand existing physical conditions at the time that he prepared his bid or for losses resulting from errors in estimating what the work would cost him and what the amount of his bid should be. The evidence before us, however, does not make it appear that the legislature, in passing the two appropriation bills in question, did in fact reimburse him for any losses of this nature. In allowing him a total, in the two bills, of $20,079.20 and in disallowing from $20,000 to $28,000 of additional losses suffered by him, the legislature did not, in so far as the evidence before us discloses, fail to properly distinguish between what would have been a pure gift and payments supported by a moral obligation and called for by the requirements of fair dealing, equity,

honor and conscience. As honest men the legislators could well regard the Territory as being under a moral obligation to allow Agassiz the two sums of money, payment of which was provided for in the two bills.

Assuming that the written release given by Agassiz at the request of the auditor was as broad in its terms as is claimed by the Territory, which is not free from doubt, that release would be material in a consideration of the legal liability of the Territory to Agassiz for further compensation; but when, as in the present instance, the legal rights of the parties are not involved and equitable rights and moral obligations alone are under consideration, the release is merely one of many circumstances to be considered. The undisputed evidence is that the committees of the legislature of 1923 had the release before them in making their investigation into the circumstances of the case.

The appeal is sustained. A decree will be entered upon presentation, requiring the auditor to issue a warrant and take such other steps, if any, as may be necessary to effectuate the payment to the appellant contemplated by Act 204, L. 1923.

*M. F. Prosser* and *E. A. Mott-Smith* for plaintiff.

*H. R. Hewitt,* Second Deputy Attorney General, for the Territory.