STATE OF HAWAII, Plaintiff-Appellee, *v.* LAUREN MUELLER, Defendant-Appellant

NO. 8732

(CR. NO. 1982-862)

NOVEMBER 3, 1983

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, AND WAKATSUKI, JJ.

618

OPINION OF THE COURT BY NAKAMURA, J.

The Supreme Court teaches us "that a right to personal privacy, or a guarantee of certain areas or zones of privacy," is implicit in the United States Constitution, *Roe v. Wade,* 410 U.S. 113, 152 (1973); Article I, Section 6 of the Hawaii Constitution explicitly declares that "[t]he right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest." Defendant-appellant Lauren Mueller (the defendant) claims the State invaded a constitutionally protected area of privacy when it prosecuted her for prostitution on the basis of sexual conduct involving two consenting adults and occurring in her home. But we are not convinced a decision to engage in sex for hire is a fundamental right in our scheme of ordered liberty, and we affirm her conviction.

I.

The defendant was charged in the District Court of the First Circuit that she "did engage in, or agree to engage in, sexual conduct with another person, in return for a fee, in violation of Section 712-1200 of the Hawaii Revised Statutes." She moved to dismiss the charge, asserting a "constitutional right to privacy for activities that were conducted in the privacy of her own home." At the hearing on the motion the parties entered into a stipulation of facts, agreeing that the activity in

question took place in Lauren Mueller's apartment, the participants were willing adults, and there were "no signs of advertising" anywhere in the apartment building.

The defendant's argument to the court was that the activity's private setting and the absence of public solicitation set her case apart "from every other prostitution case." And she maintained a decision to engage in sex with "a voluntary adult companion" was "well within her constitutional right to privacy." The district court, however, found her argument unpersuasive, ruled the State had a "compelling interest in controlling prostitution in private residences as well as on the streets," and denied the motion.

The case proceeded to trial, and the State offered the testimony of several police officers, including that of the officer responsible for arranging the assignation leading to her arrest. The defendant elected not to rebut this evidence; but she renewed her constitutional objection to the prosecution. The motion was denied again, and a judgment of conviction was entered by the district court.

II.

The sole issue posed on appeal is whether the proscriptions of Hawaii Revised Statutes (HRS) § 712-1200[1] may be applied

---

[1] HRS § 712-1200 reads:

Prostitution. (1) A person commits the offense of prostitution if the person engages in, or agrees or offers to engage in, sexual conduct with another person in return for a fee.

(2) As used in subsection (1), "sexual conduct" means "sexual intercourse," "deviate sexual intercourse," or "sexual contact," as those terms are defined in section 707-700.

(3) Prostitution is a petty misdemeanor.

(4) Notwithstanding any other law to the contrary, a person convicted of committing the offense of prostitution shall be sentenced as follows:

(a) For the first offense, a fine of $500 and the person may be sentenced to a term of imprisonment of not more than thirty days; provided, in the event the convicted person defaults in payment of the $500 fine, and the default was not contumacious, the court may sentence the person to perform services for the community as authorized by section 706-605(1)(f).

(b) For any subsequent offense, a fine of $500 and a term of imprisonment of thirty days, without possibility of suspension of sentence or probation.

to an act of sex for a fee that took place in a private apartment. With *Roe v. Wade, supra,* as the point of departure, the defendant argues the privacy guaranteed by the federal and state constitutions prevented a valid application of the statute to the act in question. We begin our analysis by examining the sources and scope of the federally established right to personal privacy.

### A.

The United States Constitution contains "no express provisions guaranteeing to persons the right to carry on their lives protected from the 'vicissitudes of the political process' by a zone of privacy or a right of personhood." L. Tribe, *American Constitutional Law* 893 (1978). But in *Griswold v. Connecticut,* 381 U.S. 479 (1965), the Supreme Court found "that specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance," 381 U.S. at 484, and concluded "[v]arious guarantees create zones of privacy."[2] *Id.* The marriage relationship, it held, was one "lying within the zone of privacy created by several fundamental constitutional guarantees." 381 U.S. at 485. And the Connecticut statute forbidding the use of contraceptives was struck down as being "repulsive to the notions of privacy surrounding the . . . relationship." 381 U.S. at 486.

---

[2] The specific guarantees, which in the Court's opinion created zones of privacy, were in the First, Third, Fourth, Fifth, and Ninth Amendments. The relevant discussion reads as follows:

Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment is one, as we have seen. The Third Amendment in its prohibition against the quartering of soldiers "in any house" in time of peace without the consent of the owner is another facet of that privacy. The Fourth Amendment explicitly affirms the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fifth Amendment in its Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

381 U.S. at 484.

Thus the privacy accorded constitutional protection by *Griswold* inhered in the marital relationship. But when the Court subsequently invalidated a Massachusetts law regulating the distribution of contraceptives in *Eisenstadt v. Baird,* 405 U.S. 438 (1972), it recognized that this right also existed apart from marriage. For as the Court explained, "[i]f the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusions into matters so fundamentally affecting a person as the decision whether to bear or beget a child." 405 U.S. at 453 (emphasis in original).

Whether the right is broad enough to accommodate a woman's decision to seek an abortion was the question in *Roe v. Wade, supra.* The Court observed that earlier decisions made "it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' *Palko v. Connecticut,* 302 U.S. 319, 325 (1937), are included in this guarantee of personal privacy." *Roe v. Wade,* 410 U.S. at 152. That the guarantee had been extended to activities relating to marriage, procreation, contraception, family relationships, and child rearing and education was also noted. *Id.* at 152-53. And the Court concluded "[t]his right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action ... or ... in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id.* at 153. However, it ruled "this right is not unqualified and must be considered against important state interests in regulation." *Id.* at 154.

The Court has also spoken very clearly in another area of intimate decision. The issue in *Stanley v. Georgia,* 394 U.S. 557 (1969), was whether "the Georgia obscenity statute, insofar as it punishes mere private possession of obscene matter, violates the First Amendment, as made applicable to the States by the Fourteenth Amendment." *Id.* at 559. The appellant's thesis was characterized as "asserting the right to read or observe what he pleases—the right to satisfy his intellectual and emotional needs in the privacy of his own home." *Id.* at 565. Though it acknowledged "the States retain broad power to regulate obscenity," the Court nevertheless held that the "power simply

does not extend to mere possession by the individual in the privacy of his own home." *Id.* at 568.

## B.

But there has been no clear and binding judicial statement on the matter of our present concern. What little we have heard from the Court on whether a decision to engage in promiscuous sexual behavior with consenting adults is within a protected zone of privacy has been in the muted tones of a summary affirmance of the decision of a three-judge district court upholding the constitutionality of a state statute making sodomy a crime and by way of dicta[3] in other decisions.

The question before the three-judge court in *Doe v. Commonwealth's Attorney,* 403 F. Supp. 1199 (E.D. Va. 1975), was whether an application of the Virginia statute prohibiting sodomy to adult males engaging in homosexual relations, consensually and in private, deprived them of their constitutional

---

[3] For example, in Griswold v. Connecticut, *supra,* Justice Goldberg in his concurring opinion stated the constitutionality of the Connecticut adultery and fornication statutes was beyond doubt. 381 U.S. at 498. The opinion also contained the following caveat: "Finally it should be said of the Court's holding today that it in no way interferes with a State's proper regulation of sexual promiscuity or misconduct." 381 U.S. at 498-99. Justice White's concurring opinion stated "the State's policy against all forms of promiscuous or illicit sexual relationships, be they premarital or extramarital, [was] concededly a permissible and legitimate legislative goal." 381 U.S. at 505. Justice Harlan based his concurring opinion on his dissent in Poe v. Ullman, 367 U.S. 497 (1961). *See* 381 U.S. at 500. The dissent in Poe v. Ullman contained this statement:

Yet the very inclusion of the category of morality among state concerns indicates that society is not limited in its objects only to the physical well-being of the community, but has traditionally concerned itself with the moral soundness of its people as well. Indeed to attempt a line between public behavior and that which is purely consensual or solitary would be to withdraw from community concern a range of subjects with which every society in civilized times has found it necessary to deal. The laws regarding marriage which provide both when the sexual powers may be used and the legal and societal context in which children are born and brought up, as well as laws forbidding adultery, fornication and homosexual practices which express the negative of the proposition, confining sexuality to lawful marriage, form a pattern so deeply pressed into the substance of our social life that any Constitutional doctrine in this area must build upon that basis. Compare *McGowan v. Maryland,* 366 U.S. 420.

367 U.S. at 545-46.

rights to due process, freedom of expression, and privacy. The district court denied the declaratory judgment and injunction sought by the plaintiffs after concluding "that the sodomy statute, so long in force in Virginia, has a rational basis of State interest demonstrably legitimate and mirrored in the cited decisional law of the Supreme Court." *Id.* at 1203.[4]

The ruling was appealed to the Supreme Court, which affirmed the three-judge court without opinion. *Doe v. Commonwealth's Attorney,* 425 U.S. 901 (1976), *aff'g mem.,* 403 F. Supp. 1199 (E.D. Va. 1975). The summary affirmance was a decision "on the merits of a case," *Hicks v. Miranda,* 422 U.S. 332, 344 (1975), and "is therefore a controlling precedent, unless and until reexamined by . . . [the] Court." *Tully v. Griffin, Inc.,* 429 U.S. 68, 74 (1976). "Since, however, it was a summary affirmance, it is not here 'of the same precedential value as would be an opinion . . . treating the question on the merits.' *Edelman v. Jordan,* 415 U.S. 651, 671." *Id.* Yet since no such opinion has been brought to our attention,[5] our quest for specific guidance on whether a federally established right protected the defendant here ends with *Doe v. Commonwealth's Attorney, supra.*

III.

We turn from privacy as expounded by the Supreme Court to the right of privacy that has been written into the Hawaii Constitution. As we observed earlier, Article I, Section 6 of the State Constitution now provides:

The right of the people to privacy is recognized and shall not be infringed without the showing of a compelling

---

[4] The cited decisional law consisted of Griswold v. Connecticut, *supra;* Justice Harlan's dissenting statement in Poe v. Ullman, 367 U.S. at 553 (1961); California v. LaRue, 409 U.S. 109, 114 (1972); and Wainwright v. Stone, 414 U.S. 21, 23-24 (1973).

[5] The Supreme Court itself observed that it "has not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating . . . [private consensual sexual] behavior among adults" in Carey v. Population Services International, 431 U.S. 678, 694 n.17 (1977).

state interest. The legislature shall take affirmative steps to implement this right.

Couched in the terse language characteristic of constitutions, the provision itself gives no clue of its intended breadth. We therefore look to an obvious extrinsic aid to construction, its history, for direction.

### A.

The language at bar was added to the Hawaii Bill of Rights during the most recent decennial review of our fundamental law. The suggestion to adopt a specific right to privacy was offered by the Committee on Bill of Rights, Suffrage and Election of the Constitutional Convention of Hawaii of 1978 as one of several proposals related to the Bill of Rights. *See* Comm. P. No. 15, Proceedings of the Constitutional Convention of Hawaii of 1978, Vol. I, at 825-27. The report accompanying Committee Proposal No. 15 discussed the proposals at length, and the discussion on the proposed privacy right furnishes an insight to what was meant to be covered.

Noting some doubt on whether the existing privacy provision in the Hawaii counterpart of the Fourth Amendment extended beyond the criminal area, the committee felt "it would be appropriate to retain . . . [this] privacy provision . . . , but limit its application to criminal cases, and create a new section as it relates to privacy in the informational and personal autonomy sense." Stand. Comm. Rep. No. 69, in Proceedings of the Constitutional Convention of Hawaii of 1978, Vol. I, at 674. An awareness "that the right of privacy has meaning varying in degree and nature" was duly recorded, and the report proceeded thereafter to "explicitly state the intent of . . . [the] Committee as to the scope and nature of the right." *Id.*

The committee believed "this right of privacy . . . [should include] the right of an individual to tell the world to 'mind your own business.' " *Id.* It cited with approval the proposition that "the right to be left alone . . . [is] the most comprehensive of rights and the right most valued by civilized men." *See Olmstead v. United States,* 277 U.S. 438, 478 (Brandeis, J., dissenting). The intended privacy, it said, gave "each and every individual the right to control certain highly personal and

intimate affairs of his own life." Stand. Comm. Rep. No. 69, *supra,* at 674. "The right to personal autonomy," it made clear, was to be "included in this concept of privacy." *Id.* "Whether an individual's desire to engage in a particular activity is protected by this aspect of the right to privacy, (the right to personal autonomy)," however, was deemed "a matter for the courts." *Id.* at 675.

## B.

The recommendation to endorse "privacy in the informational and personal autonomy sense" as a constitutional right was the subject of spirited floor debate. *See* Proceedings, *supra,* Vol. II, at 628-644. Sitting as a committee of the whole, the convention discussed the proposal at length and thereafter adopted a committee report reflecting the consensus of the assembly. The report in pertinent part reads:

By amending the Constitution to include a separate and distinct privacy right, it is the intent of your Committee to insure that privacy is treated as a fundamental right for purposes of constitutional analysis. Privacy as used in this sense concerns the possible abuses in the use of highly personal and intimate information in the hands of government or private parties but is not intended to deter the government from the legitimate compilation and dissemination of data. More importantly, this privacy concept encompasses the notion that in certain highly personal and intimate matters, the individual should be afforded freedom of choice absent a compelling state interest. This right is similar to the privacy right discussed in cases such as *Griswold v. Connecticut,* 381 U.S. 479 (1965), *Eisenstadt v. Baird,* 405 U.S. 438 (1972), *Roe v. Wade,* 410 U.S. 113 (1973), etc. It is a right that, though unstated in the federal Constitution, emanates from the penumbra of several guarantees of the Bill of Rights. Because of this, there has been some confusion as to the source of the right and the importance of it. As such, it is treated as a fundamental right subject to interference only when a compelling state interest is demonstrated. By inserting clear and specific language regarding this right into the Constitution, your Committee

intends to alleviate any possible confusion over the source of the right and the existence of it.
Comm. Whole Rep. No. 15, in Proceedings, *supra,* Vol. I, at 1024.

Thus, we are led back to *Griswold, Eisenstadt,* and *Roe* and appear to have come full circle in our search for guidance on the intended scope of the privacy protected by the Hawaii Constitution.

IV.

The defendant asserts *Griswold, et al.,* and the State Constitution placed the act for which she was prosecuted beyond the reach of HRS § 712-1200 because it was sexual activity carried on in private between two consenting adults and it was not preceded by public solicitation. There was, she claims, no state interest that compelled her prosecution under these circumstances.

Since the guaranteed freedom from intrusion extends to sexual activity among unmarried adult couples as *Eisenstadt v. Baird* suggests and to autoeroticism in the home as *Stanley v. Georgia* implies, we would have to agree there is room for argument that the right encompasses any decision to engage in sex at home with another willing adult. Moreover, as the defendant reminds us, the commentary on HRS § 712-1200 evidences that the drafters of the Penal Code found the usual reasons advanced for suppressing prostitution "are not convincing."[6] Still, "every enactment of the legislature is presump-

---

[6] The commentary on the penal code provision at issue reads in part as follows:

History has proven that prostitution is not going to be abolished either by penal legislation nor the imposition of criminal sanctions through the vigorous enforcement of such legislation. Yet the trend of modern thought on prostitution in this country is that "public policy" demands that the criminal law go on record against prostitution. Defining this "public policy" is a difficult task. Perhaps it more correctly ought to be considered and termed "public demand"—a widespread community attitude which the penal law must take into account regardless of the questionable rationales upon which it is based.

A number of reasons have been advanced for the suppression of prostitution, the most often repeated of which are: "the prevention of disease, the protection of

tively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt." *Schwab v. Ariyoshi,* 58 Haw. 25, 31, 564 P.2d 135, 139 (1977); *see also State v. Raitz,* 63 Haw. 64, 72-73, 621 P.2d 352, 359 (1980); *Bishop v. Mahiko,* 35 Haw. 608, 641 (1940); *In re Mott-Smith,* 29 Haw. 343, 346 (1926). The defendant has not met this burden, for she has not demonstrated in a convincing manner that a decision to engage in prostitution has been recognized as a fundamental right.

A.

"[O]ne aspect of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment is 'a right of personal privacy,'" *Carey v. Population Services International,* 431 U.S. at 684 (quoting *Roe v. Wade,* 410 U.S. at 152), which includes "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. 589, 599-600 (1977). "While the outer limits of this aspect of privacy have not been marked by the Court, it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions 'relating to marriage . . . , procreation . . . , contraception . . . , family relationships . . . , and child rearing and education . . . .' *Roe v. Wade, supra,* at 152-153." *Carey v. Population Services International,* 431 U.S. at 684-85 (citations omitted). It is also clear that state laws "that burden an individual's right to decide" in the foregoing areas may be justified only by a compelling state interest. *Id.* at 688.

---

innocent girls from exploitation, and the danger that more sinister activities may be financed by the gains from prostitution." These reasons are not convincing. Venereal disease is not prevented by laws attempting to suppress prostitution. If exploitation were a significant factor, the offense could be dealt with solely in terms of coercion. Legalizing prostitution would decrease the prostitute's dependence upon and connection with the criminal underworld and might decrease the danger that "organized crime" might be financed in part by criminally controlled prostitution.

Commentary on HRS § 712-1200 (footnotes omitted).

But state regulation need not meet this standard "'whenever it implicates sexual freedom'" or "'affect[s] adult sexual relations.'" *Id.* at 688 n.5.[7] For as we noted earlier, "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' *Palko v. Connecticut,* 302 U.S. 319, 325 (1937), are included in this guarantee of personal privacy." *Roe v. Wade,* 410 U.S. at 152.

The defendant has directed us to nothing suggesting a decision to engage in sex for hire at home should be considered basic to ordered liberty. Our review of Supreme Court case law in the relevant area leaves us with a distinct impression to the contrary, for we perceive no inclination on the part of the Court to exalt sexual freedom per se or to promote an anomic society. And until we learn from the Court's pronouncements that we have been misinformed, we shall continue to assume there is a "social interest in order and morality," *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571-72 (1942) (quoted in *Roth v. United States,* 354 U.S. 476, 485 (1957)), that enables a state legislature to act in this area. *Cf. Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 57-69 (1973) (States have a legitimate interest in regulating commerce in obscene material, even among consenting adults). The validity of the action, of course, is contingent upon the presence of a rational basis therefor.

B.

The drafters of the Hawaii Penal Code justified the enactment of HRS § 712-1200 on "the need for public order."[8] We

---

[7] Footnote 5 at 431 U.S. 688 reads:

Contrary to the suggestion advanced in Mr. Justice Powell's opinion, we do not hold that state regulation must meet this standard "whenever it implicates sexual freedom," *post,* at 705, or "affect[s] adult sexual relations," *post,* at 703, but only when it "burden[s] an individual's right to decide to prevent conception or terminate pregnancy by substantially limiting access to the means of effectuating that decision." *Supra,* this page. As we observe below, "the Court has not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating [private consensual sexual] behavior among adults," n. 17, *infra,* and we do not purport to answer that question now.

[8] The commentary on HRS § 712-1200 reads in pertinent part:

Our study of public attitude in this area revealed the widespread belief among

would not dispute that it was reasonable for the legislature to act on that basis. A large segment of society undoubtedly regards prostitution as immoral and degrading, and the self-destructive or debilitating nature of the practice, at least for the prostitute, is often given as a reason for outlawing it. We could not deem these views irrational. And we think the following comment by the Supreme Court on a basis for legislatures to regulate the commerce in obscene material may be apt here:

> The sum of experience, including that of the past two decades, affords an ample basis for legislatures to conclude that a sensitive, key relationship of human existence, central to family life, community welfare, and the development of human personality, can be debased and distorted by crass commercial exploitation of sex. Nothing in the Constitution prohibits a State from reaching such a conclusion and acting on it legislatively simply because there is no conclusive evidence or empirical data.

*Paris Adult Theatre I v. Slaton,* 413 U.S. at 63.

C.

Having found that defendant's decision, though arguably an intimate one, has yet to be drawn into a federally protected zone of privacy, we now consider the decision to have sex for a fee in the light of the special recognition accorded privacy by the Hawaii Constitution. Our duty is "to give effect to the intention of the framers and the people adopting" the provi-

---

those interviewed that prostitution should be suppressed entirely or that it should be so restricted as not to offend those members of society who do not wish to consort with prostitutes or to be affronted by them. Making prostitution a criminal offense is one method of controlling the scope of prostitution and thereby protecting those segments of society which are offended by its open existence. This "abolitionist" approach is not without its vociferous detractors. There are those that contend that the only honest and workable approach to the problem is to legalize prostitution and confine it to certain localities within a given community. While such a proposal may exhibit foresight and practicality, the fact remains that a large segment of society is not presently willing to accept such a liberal approach. Recognizing this fact and the need for public order, the Code makes prostitution and its associate enterprises criminal offenses.

sion. *HGEA v. County of Maui,* 59 Haw. 65, 80-81, 576 P.2d 1029, 1039 (1978).

While the report that brought the proposal to the floor of the convention in 1978 may be read as envisioning a broader right to privacy, what was approved by the framers "is similar to the privacy right discussed in cases such as *Griswold v. Connecticut,* . . . , *Eisenstadt v. Baird,* . . . , *Roe v. Wade,* . . . , etc." Comm. Whole Rep. No. 15, in Proceedings, *supra,* Vol. I, at 1024 (citations omitted). Thus, a purpose to lend talismanic effect to "the right to be left alone," "intimate decision," or "personal autonomy," or "personhood" cannot be inferred from the State provision, any more than it can from the federal decisions. However described, a freedom that is protected thereunder must still be one "ranked as fundamental" in the concept of liberty that underlies our society. *Palko v. Connecticut,* 302 U.S. at 325 (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105 (1934)). We see no evidence that we are dealing with one.

Though the trial court denied the defendant's motion to dismiss the charge on grounds that a compelling state interest had been shown, the denial was a correct result. We therefore affirm the defendant's conviction of prostitution. *Agsalud v. Lee,* 66 Haw. 425, 430, 664 P.2d 734, 738 (1983); *Hawaii Carpenters' Trust Funds v. Aloe Development Corp.,* 63 Haw. 566, 578, 633 P.2d 1106, 1113 (1981).[9]

*James D. Comack (Karl K. Sakamoto* on opening brief; *Alvin T. Sasaki* with law clerk *Keith Tanaka* on reply brief), Deputies Public Defender, for appellant.

*Arthur E. Ross,* Deputy Prosecuting Attorney, for appellee.

---

[9] Our opinion here is limited to the question of whether the right to privacy guaranteed by Article I, Section 6 of the Hawaii Constitution is broad enough to include a decision to engage in prostitution. It does not reach any other aspect of the provision and is not meant to establish its outer boundaries in any other sense.

CONCURRING OPINION OF PADGETT, J.

I concur in the affirmance of the conviction. With respect to the majority opinion's learned discussion of the scope of the constitutional right to privacy as it relates to such matters as marital relationships, birth control, abortion and pornography, none of those issues are before the court in this case, and I am unwilling to make any pronouncements on the law with regard to them in the absence of a real case with a real record.

The constitution limits us to deciding actual cases or controversies. The actual case before us involves a "hooker" who, while in her apartment, was contacted by telephone by a "john" who, unbeknownst to her, was a police officer. Over the telephone she agreed to have sex with him in her apartment for $100.

Appellant contends that her right to privacy under the state and federal constitutions protected her commercial sexual activity since it was conducted in her apartment and without advertising. The argument is novel, ingenious and insubstantial.

To quote the title of a famous madam's published memoirs "A house is not a home." The rights of privacy guaranteed by the federal and state constitutions do not bar the State from prohibiting, by statute, commercial sexual activities even if they are conducted, without advertising, as a cottage industry.